United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FREDERICK SCHIFF,

        Plaintiff,

      v.

THE CITY AND COUNTY OF SAN
FRANCISCO, et al.,

        Defendant.

_____/

No. C 08-4627 PJH

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

The parties' motions for summary judgment came on for hearing before this court on June 29, 2011. Plaintiff appeared by his counsel Thomas K. Bourke, and defendants appeared by their counsel Lauren Monson. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion and DENIES plaintiff's motion.

## BACKGROUND

Plaintiff Frederick Schiff ("Schiff") is a white male, employed for more than twenty-five years by the San Francisco Police Department ("SFPD"), part of defendant City and County of San Francisco ("the City"). Schiff, a Sergeant, has taken a number of Lieutenant promotional examinations offered by the City. Each examination resulted in the creation of an "eligible list," in which candidates were ranked according to their scores. Schiff has

United States District Court

For the Northern District of California

1  never been selected for promotion to the rank of Lieutenant.  He claims that this is because

2  the City discriminates against white candidates in the hiring and promotion of police

3  officers, and also because he has previously complained about such discrimination.

4  　　　The Rules of the San Francisco Civil Service Commission ("CSC") set forth the

5  process for making entry level and promotional appointments in the City.  Except for certain

6  positions that are exempted from the appointment and removal process, all City employees

7  must be appointed through a competitive examination process.  An eligible list ranking

8  promotional candidates is generated based on the results of such examinations, and an

9  appointing officer then uses the eligible list to make appointments to a civil service

10  classification.

11  　　　In 2003, Schiff sued the City in San Francisco Superior Court, and the case was

12  removed to this court as Schiff v. City and County of San Francisco, C-03-4345 ("Schiff I").

13  The basis of Schiff's complaint in Schiff I was "reverse discrimination" against white

14  officers, in connection with promotions made from the 1993 and 1999 Lieutenant eligible

15  lists.  Schiff alleged claims under both state and federal law, asserting, among other things,

16  that former Chiefs of Police Fred Lau and Alex Fagan, Sr., and then-Assistant Chief

17  Heather Fong, had violated his rights to equal protection of the laws and to be free from

18  racial discrimination.  In March 2006, Schiff and other plaintiffs in two related cases settled

19  with the City in exchange for receipt of monetary compensation and a release of any and all

20  claims (known or unknown) against the City, through the settlement date.

21  　　　In 2005, Schiff participated in the SFPD's Q-60 Lieutenant promotional examination.

22  The amended job announcement for the 2005 Q-60 Lieutenant promotional examination

23  (dated November 2004) provided that the "certification rule" for the examination[1] would be

24  the "Rule of Five Scores," pursuant to CSC Rule 213.3.2, unless the City's Department of

25  Human Resources determined after administration and scoring of the examination that

26

27  　　　　[1] The "certification rule" establishes the manner by which an appointing officer selects

28  individuals from an eligible list for appointment to a civil service classification.  See S.F. Civ.
Serv. Com. R. 213, et seq.

United States District Court
For the Northern District of California

1   there was an adverse impact under Title VII resulting from the Rule of Five Scores.[2]  In that

2   case, under CSC Rule 213.7, a broader certification rule would be used, but only after the

3   proposed broader rule had been presented to the CSC for approval, and had been

4   approved.  The CSC could also develop its own rule, and was not obligated to use the

5   Department of Human Resources' proposed rule.

6        CSC Rule 213.4 sets forth "secondary criteria" that may also be used to guide the

7   selection process.  The job announcement for the 2005 Q-60 Lieutenant promotional

8   examination listed the following "secondary criteria" that were to be considered by the

9   appointing officer when making appointments:  assignments, training, education, special

10  qualifications, commendations/awards, bilingual certification, and discipline history.  Under

11  the CSC Rules, secondary criteria "may not be based on relationship, race, religion,

12  gender, national origin, ethnicity, age, disability, gender identity, political affiliation, sexual

13  orientation, ancestry, marital status, color, medical condition, or other non-merit factors or

14  otherwise prohibited nepotism or favoritism."  S.F. Civ. Serv. Comm. R. 213.4.6.

15       Following the examination, Schiff was rank 29 on the final eligible list, which was

16  adopted on October 3, 2005.  However, because there were two candidates at ranks 3, 9,

17  14, 18, 22, 25, and 26, Schiff actually scored lower than 36 of the candidates on the

18  examination itself.  As explained by the City's Human Resources Director in her supporting

19  declaration, the certification rule, as indicated on the 2005 list, provided for the use of the

20  Rule of Five Scores for the first 14 hiring requisitions.  Thereafter, promotions would be

21  made based on a statistically valid grouping of candidates starting at rank 19, using a

22  sliding band of 129 points.  For the life of the list, the sliding band reached to rank 73.

23       In March 2006, the Schiff I lawsuit was settled.  Schiff received a settlement

24  payment in return for agreeing to release all claims or causes of action, "known or

25  ────────────────

26       [2]  Under the Rule of Five Scores, the Human Resources Department certifies" to the

27  appointing officer the names of eligibles with the five (5) highest scores on the list of eligibles
    for the position who are available for appointment. . . . An eligible list adopted under the Rule

28  of Five Scores shall in all cases be exhausted when eligibles standing at less than three (3)
    scores are available."  S.F. Civ. Serv. Comm. R. 213.3.3.

1    unknown," arising out of or related in any way to his employment with the City "up to and

2    including the date" that he signed the agreement.  Schiff signed the settlement agreement

3    on March 30, 2006.

4         Chief of Police Heather Fong made promotions from the 2005 Lieutenant eligible list

5    on three occasions – in June 2006, January 2008, and October 2008.[3]  In June 2006, Chief

6    Fong promoted eleven candidates – ranks 1-9 (including two candidates at rank 3, and two

7    candidates at rank 9.)  Schiff does not challenge those promotions.

8         In January 2008, Chief Fong promoted fifteen candidates from the 2005 list.  The

9    ranks promoted were 10-12, 16-18, 20-26 (including two candidates at rank 22 and two at

10   rank 28).  The first three of those ranks were promoted by the Rule of Five Scores, while

11   the remaining promotions were made from the band as provided by the certification rule.

12        That is, once fourteen promotions had been made, by operation of the certification

13   rule (the eleven candidates promoted in June 2006, plus the candidates at ranks 10, 11,

14   and 12), the reachable candidates list was expanded to include those who scored within a

15   129-point band and included those at rank 73 or higher.  Chief Fong reviewed Schiff's

16   resume in January 2008, but did not reach Schiff, or anyone below him on the 2005 List,

17   before exhausting the available requisitions.

18        Of the fifteen promotions, thirteen were male and two were female.  Twelve were

19   white, one was black, one was Asian, and one was Hispanic.  Chief Fong testified that she

20   promoted the black candidate, who ranked higher than Schiff on the 2005 List, because he

21   was well respected and considered a "star" among the Department; had significant talent

22   and potential, as well as extensive experience with weapons and field investigations, the

23   Gang Task Force, and as a liaison to the Mayor's office.

24        On January 12, 2008, Captain Theresa Barrett, who has worked for the SFPD for

25   over 23 years, was assigned to Park Station as a newly-appointed Captain.  She had

26   previously served as a Lieutenant at Northern Station for five years.  She ranked fourth on

27   _____

28        [3]  Chief Fong became acting Chief of the SFPD in January 2004, and received a
     permanent appointment as Chief in April 2004.

1   the January 2008 Captain eligible list, and was promoted under the list's Rule of Five

2   Scores.  In January 2008, the SFPD had four Captain vacancies, and Chief of Police

3   Heather Fong promoted the top four officers on the list to Acting Captain, pending

4   permanent  requisitions.  Captain Barrett received her permanent assignment in July 2009.

5          Park Station is responsible for patrol of the area bordered by Geary Boulevard,

6   Steiner Street, Market Street (and Upper Market Street), 7th Avenue, and the east end of

7   Golden Gate Park, including portions of the Western Addition neighborhood.  The Western

8   Addition has a significant concentration of gang-related activity, and Park Station works

9   closely with the community to help reduce violent crime and help the residents feel safe.

10         Captain John Ehrlich, Captain Barrett's predecessor at Park Station, had developed

11  a program of community-connected policing and crime prevention, which, according to

12  Schiff, was popular with the residents of the area.  Schiff was actively involved in this

13  program.  Schiff and Captain Ehrlich were friends, and it appears from Schiff's statements

14  and from Captain Ehrlich's declaration that both were unhappy about Captain Ehrlich's

15  transfer from Park Station and Captain Barrett's installation as Captain there.

16         Captain Barrett took Schiff to a community meeting in January 2008.  When Captain

17  Barrett explained Park Station's mission in the community, Schiff interrupted her and said,

18  "No, Captain, that is wrong, that is not how we do things."  (Schiff asserts in his declaration

19  that he was simply attempting to correct her "discretely" because she was giving out

20  incorrect information about certain SFPD procedures.)  Captain Barrett testified that upon

21  returning to the station, she immediately counseled Schiff for engaging in inappropriate and

22  insubordinate conduct.

23         During the latter part of 2008, Deputy Chief Kevin Cashman was informed that

24  federal authorities were investigating Western Addition gangs, that many gang members

25  would be arrested, and that individuals who were considered "snitches" by gang members

26  would be in danger.  Schiff is known as a police officer to local gang members, including

27  members of the Knock Out Posse ("KOP"), a violent criminal street gang located in the

28  Western Addition, which is subject to a 2007 Civil Gang Injunction issued by the San

United States District Court

For the Northern District of California

1    Francisco Superior Court.

2         Schiff had a personal relationship with Linda Yoakum, a resident of the Western

3    Addition.  He frequently spent time at her home and took her children on outings with his

4    own children.  Ms. Yoakum worried that local gangs would view her son "M" as a snitch,

5    based on Schiff's relationship with her and the amount of time he spent at her home.  Ms.

6    Yoakum even arranged for Schiff to meet "M" away from the house when going on outings.

7         On September 19, 2008, a KOP gang member threatened Ms. Yoakum, stating,

8    "You know what happens to people that work with the police.  The community is talking

9    about you."  Ms. Yoakum understood this to be a threat of gang reprisal, and informed

10   Schiff of the threat on the morning of Saturday, September 20, 2008, as he picked up her

11   children for a weekend outing at the Delta.

12        In  violation of SFPD policy, Schiff failed to immediately report this incident to his

13   superior officers.  Schiff did not file a police report, or otherwise follow up to ensure that Ms.

14   Yoakum had appropriate police protection during the weekend, stating that he "did not feel

15   it needed to be done" and that he did not want to have to answer to Captain Barrett

16   regarding the situation.  Schiff conceded that had Captain Ehrlich still been at Park Station,

17   he "absolutely" would have reported the incident to him, even if Ms. Yoakum had already

18   done so.

19        According to Ms. Yoakum, Schiff instructed her to notify Captain Barrett of the

20   threat.  Ms. Yoakum states in her declaration that she did call Captain Barrett on

21   September 20, 2008, to notify her of the incident, and that Captain Barrett told her to come

22   to the police station on Monday, September 22, 2008 to make a police report.  Ms. Yoakum

23   testified at a subsequent Police Commission hearing that she was "upset" about the threat.

24   Captain Barrett testified that in response to this notification from Ms. Yoakum, she

25   contacted the Lieutenant on duty at Park Station and asked that patrols be increased in the

26   area of Ms. Yoakum's residence.

27        On Monday, September 22, 2008, Ms. Yoakum went to Park Station to meet with

28   Captain Barrett and make a police report.  On her way to the station, another KOP gang

1  member signaled to her with a hand gesture that he was watching her.  Ms. Yoakum later

2  testified that she was upset about the threats to her family.

3      Captain Barrett directed Schiff to write a memo explaining why he failed to take

4  proper action, issued him a counseling, and notified Chief Deputy Cashman of her

5  concerns regarding Schiff's response to the reported threat.  Having determined that there

6  was a perception that the child and his family were working as informants for the police

7  department, and in order to protect the juvenile, Deputy Chief Cashman issued an order on

8  September 25, 2008 ("the stay-away order"), directing Schiff to have no contact with Ms.

9  Yoakum or her family.

10     According to Captain Barrett, following the September 2008 incident at the

11 community meeting, and her counseling of Schiff afterwards, Schiff began challenging her

12 qualifications and leadership to other officers.  Captain Barrett reported this conduct to her

13 chain of command and requested that Schiff be transferred.  Chief Fong, through her

14 command staff, instead instructed Captain Barrett to counsel Schiff and to document her

15 concerns about Schiff's behavior.

16     Captain Barrett subsequently learned that Schiff was discrediting her to a member of

17 the Board of Supervisors and asking the Supervisor to intervene to have her transferred.

18 Schiff also wrote a letter to the Supervisor's staff to that effect.  Captain Barrett informed

19 her chain of command of Schiff's continuing misconduct and asked that Schiff be

20 transferred.  Chief Fong, through the chain of command, again directed Captain Barrett to

21 continue to supervise Schiff and manage his performance issues.  Schiff received no

22 discipline for this incident.

23     In October 2008, Chief Fong made sixteen promotions from the 2005 Lieutenant

24 eligible list.  The ranks promoted were 13-15, 18, 25, 32, 37, 39, 40, 44, 48-50, 54, 59, and

25 66.  Nine of the promoted candidates were white, three were Hispanic, three were Asian,

26 and one was black.  The black candidate was rank 66, and thus scored lower than Schiff

27 did on the exam.

28     The 2005 Lieutenant eligible list expired on October 2, 2008.  A total of 42

7

1   individuals were promoted from the 2005 list.  Thirty-one of these promotions were of

2   officers who ranked above Schiff on the eligibility list.  Only two of the candidates promoted

3   from that list were black.  Thirty were white.

4          Chief Fong testified that in making decisions regarding promotions from the 2005

5   list, she first filled the initial 14 requisitions, and then reviewed the banding resumes of all

6   candidates in the band, as well as the updated disciplinary histories of the candidates.  She

7   also considered the demonstrated specialized skills, qualities and experience of each

8   candidate, and the specialized needs of the Department.  She testified that she sought to

9   promote the candidates best qualified to perform the demanding responsibilities of the

10  Lieutenant rank, and did not consider any applicant's race or gender.  Nor did she consider

11  whether any candidate had sued the Department in the past.

12         On October 6, 2008, four days after the expiration of the 2005 Lieutenant eligible list,

13  and only days after Chief Fong's final promotions from the 2005 list, Schiff filed the present

14  action ("Schiff II").  The complaint as originally filed alleged causes of action for

15  (1) discrimination, harassment, and retaliation, 42 U.S.C. § 1981, (2) violation of due

16  process and equal protection rights under 42 U.S.C. § 1983, (3) racial discrimination and

17  retaliation in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C.

18  § 2000e, et seq., and (4) racial discrimination and retaliation in violation of the California

19  Fair Employment and Housing Act ("FEHA"), Cal. Govt. Code § 12940(h).  Named as

20  defendants were the City, the SFPD, and Chief Fong.

21         Schiff asserts that he was denied a promotion to Lieutenant from the 2005 eligible

22  list because of racial discrimination, and in retaliation for having complained to the

23  Department of Fair Employment and Housing about racial discrimination in 1999, for having

24  been being a plaintiff in Schiff I action, and for having written a memoranda in September

25  2003 accusing Chief Fong of perjury and misconduct.  He also alleges that defendants,

26  knowing they would not be selecting him for the position of Lieutenant off the 2005 list,

27  began to harass him by falsely accusing him of "petty incidents of misconduct" in an effort

28  to "make a file" on him in order to justify their eventual nonselection.  The only adverse

United States District Court
For the Northern District of California

8

1    employment action alleged in the complaint is his non-promotion to Lieutenant.

2         On April 14, 2009, the court issued an order dismissing the claims asserted against

3    the SFPD (on the basis that the SFPD is an agency of the City), and also dismissing the

4    due process claim in the second cause of action, and the equal protection claim in the

5    second cause of action, to the extent that it was premised on alleged retaliation or on any

6    claim other than racial discrimination.

7         Thus, remaining in the present case are claims of discrimination, retaliation, and

8    harassment under § 1981 and Title VII; a claim of discrimination in violation of equal

9    protection rights under § 1983; and claims of discrimination and retaliation under FEHA.

10   The § 1981 claims, the § 1983 claim, and the FEHA claims are alleged against both the

11   City and Chief Fong, and the Title VII claims are alleged against the City only.  The basis of

12   the complaint is that the City failed to promote Schiff to the position of Lieutenant from the

13   2005 Lieutenant eligible list, which expired on October 2, 2008.

**DISCUSSION**

15   A.    Legal Standard

16        A party may move for summary judgment on a "claim or defense" or "part of . . . a

17   claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

18   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

19   matter of law.  Id.

20        A party seeking summary judgment bears the initial burden of informing the court of

21   the basis for its motion, and of identifying those portions of the pleadings and discovery

22   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

23   v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

24   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

25   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

26   verdict for the nonmoving party.  Id.

27        Where the moving party will have the burden of proof at trial, it must demonstrate

28   that no reasonable trier of fact could find other than for the moving party.  Soremekun v.

United States District Court

For the Northern District of California

9

United States District Court

For the Northern District of California

1   Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir. 2007).  On an issue where the nonmoving

2   party will bear the burden of proof at trial, the moving party can prevail by pointing out to

3   the district court that there is an absence of evidence to support the nonmoving party's

4   case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its initial burden, the

5   opposing party must set out specific facts showing a genuine issue for trial in order to

6   defeat the motion.  Anderson, 477 U.S. at 250; see also Fed. R. Civ. P. 56(c), (e).

7       When deciding a summary judgment motion, a court must view the evidence in the

8   light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

9   Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

10  B.     The Motions

11      Defendants seek summary judgment as to all causes of action asserted in the

12  complaint.  Schiff does not oppose the motion as to the Title VII and FEHA claims, or as to

13  the § 1981 harassment claim, and provides no evidence in support.  Accordingly, the

14  motion is GRANTED as to those claims.

15      Schiff seeks partial summary judgment on two "issues" – a ruling that the City's

16  practice of "banding" violated his right to equal protection, and a ruling that defendants'

17  articulated reason for not selecting him for a promotion in January 2008 was pretexual

18  because it was not race-neutral.

19          1.     Monell claims

20      Defendants contend that the claims against the City fail because Schiff cannot

21  establish liability as required under Monell v. Dep't of Social Services, 436 U.S. 658, 691

22  (1978).

23      Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where

24  official policy or custom causes a constitutional tort.  See Monell, 436 U.S. at 690.

25  However, a city or county may not be held vicariously liable for the unconstitutional acts of

26  its employees under the theory of respondeat superior.  Board of County Comm'rs. of

27  Bryan County v. Brown, 520 U.S. 397, 403 (1997); Monell, 436 U.S. at 691; see also

28  Federation of African Am. Contractors v. Oakland, 96 F.3d 1204, 1215 (9th Cir. 1996)

United States District Court

For the Northern District of California

1   (applying Monell analysis to suit under § 1981).

2        Liability may not be imposed against a municipality for claimed violations of

3   constitutional rights unless deliberate action attributable to the municipality itself is the

4   moving force behind the alleged deprivation of constitutional rights.  Bryan County, 520

5   U.S. at 400.  That is, the plaintiff must show not only that he suffered a constitutional

6   violation at the hands of a municipal employee, but must also show that an act of the

7   municipality itself, taken with deliberate indifference to known or obvious consequences,

8   led the employee to deprive the plaintiff of his constitutional rights.  Id.

9        The action inflicting the injury must flow from an explicitly adopted or a tacitly

10  authorized municipal policy.  "Official municipal policy includes the decisions of a

11  government's lawmakers, the acts of its policymaking officials, and practices so persistent

12  and widespread as to practically have the force of law."  Connick v. Thompson, 131 S.Ct.

13  1350, 1359 (2011).

14       In order to establish an official policy or custom sufficient for Monell liability, a

15  plaintiff must show either a violation resulting from an employee acting pursuant to an

16  expressly adopted official policy, or an employee acting pursuant to a long-standing

17  practice, or an employee acting as a "final policymaker."  Delia v. City of Rialto, 621 F.3d

18  1069, 1081-82 (9th Cir. 2010); see also Plumeau v. School Dist. No. 40 County of Yamhill,

19  130 F.3d 432, 438 (9th Cir. 1997); Federation of African Am. Contrs., 96 F.3d at 1214-15.

20  The City contends that Schiff cannot establish Monell liability in any of these ways.

21       First, the City contends that Schiff cannot show that his non-promotion to Lieutenant

22  resulted from a formal governmental policy or longstanding practice or custom that is the

23  standard operating procedure of the City.

24       In opposition, Schiff asserts that the City has a "long-established pattern practice

25  and custom with respect to discriminating against non-blacks in the SFPD's examination

26  and selection promotional processes."  He claims that the City's practice of discrimination

27  started in the years before Schiff I, and has persisted through to the present, referring to

28

11

United States District Court

For the Northern District of California

1    prior suits filed against the City, including the Officers for Justice case.[4]

2         Schiff contends that since the 1990s, the City has continued to use "banding" to

3    "enlarge the number of black officers who would be eligible to be promoted."  He asserts

4    that in Schiff I, the evidence showed that the City had promoted all the black candidates on

5    the list.

6         Second, the City asserts that Schiff cannot show that the individuals responsible for

7    the decisions regarding promotions were officials with final policymaking authority.  The

8    City contends that the CSC is the final policymaker with respect to employment matters in

9

10         [4]  Thirty-eight years ago, in 1973, a group of black, Latino, Asian, and female police
11    officers, and Officers for Justice, an organization representing minority officers, sued the City
      and the SFPD in federal court, alleging discrimination in hiring and promoting, and seeking to
12    integrate the SFPD with female and minority-race officers.  See Officers for Justice v. San
      Francisco Civil Service Commission, C-73-0657 (N.D. Cal.).  In 1977, the United States filed
13    its own action against the City arising out of the same allegations.  See United States of
      America v. City and County of San Francisco, C-77-2884 (N.D. Cal.).

14
           The cases were consolidated, and the litigation was eventually settled by consent
15    decree in 1979.  See Officers for Justice v. Civil Serv. Comm'n, 473 F.Supp. 801 (N.D. Cal.
      1979).  The consent decree was signed by the City, the U.S. Department of Justice, Officers
16    for Justice, and the San Francisco Police Officers Association (which had intervened).  One
      plaintiff appealed, which necessitated review of the consent decree by the Ninth Circuit.  In an
17    order issued approximately two years later, the Ninth Circuit affirmed the district court's order
      validating and approving the consent decree.  See Officers for Justice v. Civil Serv. Comm'n,
18    688 F.2d 615 (9th Cir. 1982).

19         The consent decree provided for termination after ten years, but in 1986 the district
      court extended some of its provisions beyond the 1989 date, because many of the promotions
20    required under the consent decree had still not been made.  The court ruled that certain
      provisions would continue until the City moved for termination.  The Ninth Circuit upheld the
21    extension.  See Officers for Justice v. Civil Serv. Comm'n, 934 F.2d 1092 (9th Cir. 1991).

22         In 1991, the San Francisco Police Officers Association, which had intervened in the
      Officers for Justice litigation, appealed a decision by the district court declaring "banding" to
23    be a legally valid scoring procedure for promotion examinations to certain ranks in the SFPD.
      The court's decision allowed the City to treat scores that fell within a statistically derived "band"
24    as statistically equivalent for purposes of evaluating the knowledge, skills, and abilities
      measured by a particular examination. The City sought to band some test scores as a method
25    of complying with the 1979 consent decree, and to use race, professional conduct, education,
      training, and experience as criteria to be used in selecting candidates for promotion from within
26    the band.  The Ninth Circuit affirmed the use of banding and the proposed selection criteria.
      See Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721 (9th Cir. 1992).

27
           In October 1998, the district court terminated the consent decree pursuant to stipulation
28    (although additional litigation ensued).  See Officers for Justice v. Civil Serv. Comm'n, 2009
      WL 1773130 (N.D. Cal., June 22, 2009).

United States District Court
For the Northern District of California

1    San Francisco, and that Schiff has not identified any specific policy of the City or the CSC

2    that caused his alleged injuries, but rather asserts only that personnel actions specific to his

3    own employment establish the City's liability.

4        In response, Schiff argues that he can demonstrate that the actions taken against

5    him were by persons with final policymaking authority for the City.  He contends that the

6    Chief of Police has final policymaking authority regarding employment matters, based on

7    the provisions of California Government Code § 38630(a) ("[t]he police department of a city

8    is under the control of the chief of police"); and San Francisco Administrative Code § 2A.30

9    ("[e]ach department head shall be immediately responsible for the administration of his or

10   her department; . . . "[t]he department head shall act as the 'appointing officer' under the

11   civil service provisions of the Charter for the appointing, disciplining and removal of such

12   officers, assistants and employees as may be authorized").  He also claims that with regard

13   to the issuance of the stay-away order, Chief Fong was the final policy-maker.

14       Third, the City argues that Schiff cannot show that any individual with final

15   policymaking authority delegated that authority to a subordinate, or ratified the actions that

16   he claims were discriminatory.  Schiff does not oppose this part of the motion.

17       The court finds that summary judgment must be GRANTED as to the claims

18   asserted against the City.  First, Schiff has not identified any specific policy of the City or of

19   the CSC that caused his alleged injuries.  His argument that the City has a "long-

20   established pattern, practice, and custom" is a reference to events that may have been at

21   issue in Schiff I, but those events are irrelevant to the present action.

22       To the extent Schiff is challenging the decision to adopt a form of "banding" as a

23   certification rule for the 2005 Lieutenant eligible list, he has not provided any evidence

24   showing that that decision constituted an official City policy of discrimination against white

25   candidates.  In addition, the decision to adopt a form of banding for the 2005 list was made

26   by the CSC in August 2005, more than six months prior to the date that Schiff agreed to a

27   release of all claims, "known or unknown," arising out of or relating in any way to his

28   employment with the City, "up to and including the date" he signed the agreement.

**United States District Court**
For the Northern District of California

1    Only deprivations occurring pursuant to municipal custom or policy can give rise to

2    municipal liability.  Thus, a plaintiff must establish the existence of an official policy, and

3    that this policy evidences a deliberate indifference to his constitutional rights.  <u>Oviatt v.</u>

4    <u>Pearce</u>, 954 F.2d 1470, 1476-77 (9th Cir. 1992).  Here, Schiff has failed to present any

5    admissible evidence showing that the City had a policy or custom of promoting individuals

6    on the basis of race during the relevant time period.

7    And even were there evidence of some unwritten policy of discrimination in this

8    case, which there is not, that "policy" cannot be one of never promoting white candidates,

9    or even of never promoting white male candidates, as the evidence shows that of the 42

10   candidates promoted from the 2005 Lieutenant eligible list, more than 70% were white

11   males.

12   As for the stay-away order, it cannot be considered a "policy" for purposes of

13   <u>Monell</u>, as Schiff has provided no evidence that it was based on an expressly-adopted City

14   policy or on a long-standing City practice.

15   Second, the court finds that Schiff has not shown that Chief Fong had final

16   policymaking authority with respect to promotions.  Municipal liability "attaches only where

17   the decision maker possesses final authority to establish municipal policy with respect to

18   the action ordered."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986).  Making a

19   promotion is not a final policy decision, but rather an exercise of discretion vested in an

20   appointing officer.  <u>See</u> <u>Texas Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981).

21   Whether a particular official has final policymaking authority is a question of state

22   law.  <u>McMillian v. Monroe County</u>, 520 U.S. 781, 786 (1997); <u>see also</u> <u>Cortez v. County of</u>

23   <u>Los Angeles</u>, 294 F.3d 1186, 1189 (9th Cir. 2001); <u>Federation of African Am. Contrs.</u>, 96

24   F.3d at 1235.  The fact that a city employee has independent decision-making power does

25   not render him a final policymaker for purposes of municipal liability.  "If the mere exercise

26   of discretion by an employee could give rise to a constitutional violation, the result would be

27   indistinguishable from respondeat superior liability."  <u>City of St. Louis v. Prapotnik</u>, 485 U.S.

28   112, 126 (1988); <u>Pembaur</u>, 475 U.S. at 484 n.12.

United States District Court

For the Northern District of California

1   Under the California Constitution, charter cities are specifically provided the authority

2   to constitute, regulate, and govern city police departments.  Brown v. City of Berkeley, 57

3   Cal. App. 3d 223, 236 (1976).  Government Code § 38630(a) – providing that the police

4   department of a city is under the control of the chief of police – does not apply to charter

5   cities, but only to general law cities.  Id.  San Francisco is a charter city and county under

6   the California Constitution and laws of the State of California.  See Cal. Const. Art. XI, §

7   5(a); S.F. Charter Preamble; Perry v. Schwarzenegger, 704 F.Supp. 2d 921, 953 (N.D. Cal.

8   2010); Cypress Sec. LLC v. City and County of San Francisco, 184 Cal. App. 4th 1003,

9   1011 (2010).

10   The Charter of the City and County of San Francisco makes clear that the San

11   Francisco CSC is the final policymaker with respect to employment matters.  See Hyland v.

12   Wonder, 117 F.3d 405, 414 (9th Cir. 1997) ("under California law, a city's Charter

13   determines municipal affairs such as personnel matters").  Pursuant to the City Charter, the

14   CSC "is charged with the duty of providing qualified persons for appointment to the service

15   of the City and County."  S.F. Charter § 10.100.  Further, it is the responsibility of the CSC

16   to adopt "rules, policies and procedures" to govern an exhaustive list of topics relating to

17   city employment.  S.F. Charter § 10.101.

18   Under the City Charter, "[w]henever a position controlled by the civil service

19   provisions of this Charter is to be filled, the appointing officer shall make a requisition to the

20   department of human resources for a person to fill it" and the department "shall certify to

21   the appointing officer the names and addresses of all those persons meeting the

22   certification rule."  S.F. Charter, Appendix A, § A8.329.  Further, "[t]he Civil Service

23   Commission shall establish certification rules" which "shall not be more restrictive than the

24   certification of all candidates receiving the three highest scores on the list of eligibles for

25   each position."  The appointing officer "shall fill the position by the appointment of one of

26   the persons certified."  Id.

27   The CSC has exercised this grant of power by adopting numerous rules on an

28   exhaustive list of employment issues including, but not limited to, appointment to civil

United States District Court
For the Northern District of California

1   service positions, equal opportunity, employer-employee relations, layoff, and separation.

2   See, e.g., S.F. Civ. Serv. Comm'n Rules 103, 110, 114, 121, 122.13.  As the final

3   policymaker for personnel matters, the CSC is free to delegate broad operational authority

4   to a municipal department – including authority over personnel policy – without turning that

5   department into a "final policymaker" for purposes of municipal liability.  Prapotnik, 485 U.S.

6   at 127-28.

7        Where, as here, an appointing officer has the authority to hire and fire workers, but

8   not the responsibility for establishing employment policy, the personnel decisions of the

9   appointing officer cannot be attributed to the municipality.  See Pembaur, 475 U.S. at 483

10  n.12.  Thus, Chief Fong did not have final policymaking authority with regard to promotion

11  decisions.  As for the stay-away order, it was issued by Deputy Chief Cashman, not by

12  Chief Fong; and even if Chief Fong authorized it, she is not a final policymaker for purposes

13  of Department management.  Under the City Charter, that authority lies with the Police

14  Commission.  See Coming Up, Inc. v. City and County of San Francisco, 830 F.Supp.

15  1302, 1308-09 (N.D. Cal. 1993).

16       Finally, Schiff has not established that any individual with final policymaking authority

17  delegated that authority to a subordinate, or ratified a subordinate's unlawful decision or

18  action.  In determining whether policymaking authority has been delegated to a municipal

19  official, "courts consider whether the official's discretionary decision is constrained by

20  policies not of that official's making and whether the official's decision is subject to review

21  by the municipality's authorized policymakers."  Christie v. Iopa, 176 F.3d 1231, 1236-37

22  (9th Cir. 1999) (citation and quotation omitted).  "[D]elegating discretion is not equivalent to

23  delegating final policymaking authority."  See id. at 1238; see also Webb v. Sloan, 330 F.3d

24  1158, 1165-66 (9th Cir. 2003).  Schiff has made no showing that the CSC delegated final

25  policymaking authority to any individual, or ratified a subordinate's unlawful decision or

26  action.

27       In short, Schiff's claims against the City fail because he has not produced evidence

28  sufficient to show a custom or practice of discrimination against non-black officers in the

1    SFPD during the period of time following the settlement of the <u>Schiff I</u> action and the filing

2    of the present action.  His citations to cases decided under the consent decree in <u>Officers</u>

3    <u>for Justice</u> cannot be considered as evidence of a custom or practice of discrimination, as

4    they are not relevant to the certification rule at issue in this action – the certification rule for

5    the 2005 Lieutenant eligible list.

6        Finally, the court notes that after Chief Fong became Chief in 2004, her first round of

7    promotions from the list did not include a single black candidate, and the evidence shows

8    that in 2008, she did not promote every black candidate from the 2005 list.  Accordingly,

9    Schiff's argument that the "standard operating procedure" at the SFPD was to appoint

10   every black candidate from the list without merit.

11       To the extent that the City may have had a policy of using banding before 2005 to

12   vary the racial composition of the police force – which policy the City adopted as an attempt

13   to comply with the prior consent decree – such policy was challenged in <u>Schiff I</u>, and can

14   no longer be challenged by operation of the settlement and release signed by the plaintiffs

15   in <u>Schiff I</u>.  The fact that the City may have engaged in that policy at the time of <u>Officers for</u>

16   <u>Justice</u> is irrelevant to the present action, and cannot be used as evidence to support

17   Schiff's claim that the City has a "long history" of using banding as a discriminatory tool.

18   Schiff fails to show that the certification rule for the 2005 Lieutenant's exam, which provided

19   for the use of banding, resulted in a deprivation of his civil or constitutional rights, and he

20   has no evidence of any official policy by the City that caused him constitutional injury.

21       Finally, there can be no <u>Monell</u> claim if the plaintiff has not established a

22   constitutional violation by an individual defendant.  A city or county cannot be liable for

23   damages based on the actions of one of its employees unless the employee inflicted

24   constitutional harm.  <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986).  Thus, a

25   plaintiff in a § 1983 case must provide evidence of a policy that resulted in the deprivation

26   of the plaintiff's civil rights, and must show that an individual officer, acting pursuant to that

27   policy, inflicted constitutional harm on the plaintiff.  <u>Quintanilla v. City of Downey</u>, 84 F.3d

28   353, 355 (9th Cir. 1996).  As explained below, Schiff has failed to do that.

United States District Court

For the Northern District of California

1          2.      Discrimination claims

2          Defendants assert that Schiff's discrimination claims fail because he has no

3    evidence of racial discrimination.  When analyzing claims of disparate treatment in

4    employment under § 1981 or § 1983, a district court is guided by Title VII analysis.  Surrell

5    v. California Water Serv. Co., 518 F.3d 1097, 1103, (9th Cir. 2008); Mustafa v. Clark

6    County Sch. Dist., 157 F.3d 1169, 1180 (9th Cir. 1998); see also Manatt v. Bank of

7    America NA, 339 F.3d 792, 979 (9th Cir. 2003) (federal courts apply the same standards in

8    § 1981 and § 1983 actions as they do in Title VII race discrimination cases).

9          In responding to a motion for summary judgment on claims under Title VII, a plaintiff

10   may proceed by using the burden-shifting framework of McDonnell Douglas Corp. v. Green,

11   411 U.S. 792 (1973), or by "simply produc[ing] direct or circumstantial evidence

12   demonstrating that a discriminatory reason more likely than not motivated the employer."

13   Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007).  Defendants argue that Schiff

14   has no direct evidence of discrimination, and cannot satisfy his burden under the

15   McDonnell Douglas test.

16         In response, Schiff contends that he can show a genuine issue of material fact as to

17   race discrimination, both directly and under the McDonnell Douglas test.  First, Schiff

18   asserts that direct evidence of discriminatory intent includes the fact that the City initially

19   implemented banding as a means of complying with the consent decree approved by the

20   district court in March 1979, and that the City "manipulated" exam scores to benefit non-

21   white candidates.

22         Schiff notes that in Officers for Justice, the Ninth Circuit found that "the consent

23   decree itself provides a proper rationale for race conscious promotions and serves as a

24   valid defense against the [Police Officer's Association's] reverse discrimination arguments."

25   Officers for Justice, 979 F.2d at 727.  He asserts that because of the termination of the

26   consent decree, the City no longer has a proper rationale for "race-conscious promotions,"

27   but claims that the City's practice of banding continued as part of the certification rule for

28   the 2005 Lieutenant's exam, through the expiration of the 2005 Lieutenant eligible list on

United States District Court

For the Northern District of California

1    October 2, 2008.

2         Schiff bases his assertion that banding is a "race-conscious scheme" on the

3    statement in the July 2004 announcement for the Q-60 Lieutenant promotional examination

4    that the certification rule for the examination would be the Rule of Three Scores, unless the

5    City's Human Resources Department determined that there would be an adverse impact

6    under Title VII.  In his own motion for summary judgment Schiff seeks a ruling that banding

7    is "a form of race-norming" and is "a discriminatory selection tool" that violated his rights to

8    equal protection, because it allowed the City to select black candidates from the band who

9    would not otherwise be reachable under the Rule of Three Scores.

10         Schiff also contends that the City's internal documents demonstrate that banding is

11   the tool the City used to discriminate by "artificially enlarging the pool of minority applicants

12   so that more will be selected."  He refers specifically to a 32-page "Job Analysis," prepared

13   by the City in April 2008 for the position of Lieutenant, which he claims shows that a

14   "hypothetical" band of 43 points "allows the City to have a black selection rate of 45% when

15   the pool of eligible blacks is only 18%" – or, conversely, that "the pool of white applicants

16   (which is 39%) shrinks to a selection rate of 26%."  However, this referenced "Job Analysis"

17   is a 32-page document, and Schiff does not explain which part supports his argument, or

18   what the job analysis even means or why it was created by the City.

19         Second, Schiff claims that he can also meet his burden under the McDonnell

20   Douglas test.  Under that analysis, a plaintiff must first establish a prima facie case of

21   employment discrimination.  Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).  If

22   he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory

23   reason for its employment decision.  Id.; Surrell, 518 F.3d at 1106.

24         Once that burden is met, the inference of discrimination or retaliation raised by the

25   prima facie case is dispelled.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

26   The plaintiff must then provide evidence showing that the asserted reason was a pretext for

27   unlawful discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S.

28   133, 146-50 (2000).  At all times, the plaintiff bears the "ultimate burden" of persuasion.

United States District Court

For the Northern District of California

1    See Burdine, 450 U.S. at 256.

2        Defendants contend that Schiff's claims fail because he cannot establish a prima

3    facie case of discrimination, and because SFPD had legitimate non-discriminatory reasons

4    for its decisions, against which Schiff has no evidence of pretext.

5        A plaintiff may establish a prima facie case of disparate treatment by showing that

6    he is a member of a protected class; that he was qualified for his position and performing

7    his job satisfactorily; that he experienced an adverse employment action; and that "similarly

8    situated individuals outside [his] protected class were treated more favorably, or other

9    circumstances surrounding the adverse employment action give rise to an inference of

10   discrimination."  Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004); see

11   also Fonseca v. Sysco Food Servs. of Ariz. Inc., 374 F.3d 840, 847 (9th Cir. 2004).

12       Schiff contends that he meets the prima facie case because he is white, he took the

13   examination for Lieutenant, and he suffered adverse employment actions.  Defendants

14   assert, however, that Schiff cannot show that he suffered an adverse employment action,

15   and cannot show he was treated differently than other similarly situated employees (or that

16   there is any other causal link between his status and the adverse action).

17       Schiff points to three incidents that he claims constitute adverse actions – the non-

18   promotion in January 2008, the issuance of the stay-away order in September 2008, and

19   the non-promotion in October 2008 (when he claims he was passed over in favor of a black

20   candidate who scored lower on the 2005 eligible list).

21       With regard to the non-promotion in January 2008, the evidence shows that Chief

22   Fong exhausted all the available requisitions with appointments who ranked above Schiff,

23   and skipped over eight other candidates who ranked above Schiff in this round.  Schiff has

24   articulated no theory under which the promotion of candidates who ranked higher than he

25   did can be considered an adverse employment action, particularly given that the evidence

26   shows that 12 of the 15 candidates promoted in January 2008 were white.

27       With regard to the September 2008 stay-away order, the issuance of that order

28   cannot be considered an adverse  employment action, because it was not an action that

20

**United States District Court**
For the Northern District of California

1   caused a material change in the terms and conditions of Schiff's employment.  See, e.g.,

2   Chuang v. University of Cal., Davis, Bd. of Trustees, 225 F.3d 1115, 1125-26 (9th Cir.

3   2000).  Moreover, the stay-away order was not punitive in nature, as there was no

4   discipline involved.  The evidence shows that its sole purpose was to protect the safety and

5   security of a community member and her family from future threats and harm by a violent

6   gang.

7       Indeed, when asked how it affected his job, Schiff merely related how it affected his

8   relationship with the family, but cited to no adverse effect on his employment, and admitted

9   that he would still be able to respond to the family for specific police actions.  Schiff has

10  provided no evidence of any causal link between the stay-away order and his race or

11  protected activity.  Nor has he pointed to any evidence showing that similarly-situated black

12  officers received better treatment than he did.

13      Schiff also appears to be arguing that certain conduct by Captain Barrett was

14  discriminatory, although he has not identified any adverse employment action perpetrated

15  by Captain Barrett.  Moreover, the evidence shows that Captain Barrett was not involved in

16  the recommendation of discipline, and, in any event, Deputy Chief Cashman testified that it

17  was he, not Captain Barrett, who issued the stay-away order.  In fact, when asked at his

18  deposition whether the claimed treatment by Captain Barrett was discriminatory, Schiff

19  replied, "I don't know."

20      With regard to the non-promotion in October 2008, and Schiff's claim that the City

21  passed over him in favor of a black candidate who was ranked lower than he was,

22  defendants concede that this non-promotion in October may arguably be considered an

23  adverse employment action, but also note that the evidence shows that of the 16

24  candidates promoted in October 2008, when Chief Fong reached Schiff's rank on the 2005

25  Lieutenant eligible list, the first 15 were not black.  Moreover, only two of the total 42

26  candidates who were promoted from the 2005 List were black, and 31 of the 42 candidates

27  promoted ranked above Schiff (including one black candidate), and 11 ranked lower

28  (including one black candidate).  Thus, defendants assert, such facts do not support an

1   inference of a causal link between Schiff's race and the decision not to promote him to

2   Lieutenant.

3        Nevertheless, because the burden of establishing a prima facie case is "not

4   onerous," Burdine, 450 U.S. at 253; see also Wallis v. J.R. Simplot Co., 26 F.3d 885, 889

5   (9th Cir. 1994), the court will assume, for the sake of argument, that Schiff has established

6   a prima facie case.  The burden thus shifts to the defendants to provide evidence showing

7   that they had legitimate, non-discriminatory reasons for their actions.

8        Defendants have articulated legitimate non-discriminatory reasons for not promoting

9   Schiff.  In January 2008, each of the officers selected for promotion was qualified for the

10  rank of Lieutenant and ranked above Schiff on the eligible list.  In October 2008, when the

11  Department reached Schiff on the list, Chief Fong chose not to promote him due to

12  legitimate concerns regarding his performance, based on complaints of insubordination and

13  concerns regarding poor judgment in not following up on a reported threat against a

14  community member – not to mention Schiff's open challenges to his commanding officer's

15  authority.

16       Defendants have also articulated legitimate non-discriminatory reasons for issuing

17  the stay away-order (even though it cannot reasonably be considered an adverse

18  employment action).  The evidence shows that the SFPD had received information that Ms.

19  Yoakum was threatened twice within a weekend period by known gang members.  Schiff

20  himself submitted a memorandum detailing increased scrutiny on Ms. Yoakum and her

21  family by the KOP gang due to her interactions with the police.

22       Schiff was a known police officer in the area and had constant contact with the

23  Yoakum family, including taking their children on weekend outings and driving them around

24  in his vehicle.  Ms. Yoakum was concerned with her son's close contact with Schiff and had

25  asked him to pick up and drop off her son in an alternate location so that gang members

26  would not see Schiff's association with her son.  Accordingly, the SFPD had sufficient

27  concern for the safety of this family to take action to put distance between Schiff and the

28  family in order to avoid unnecessary violence or further threats.

United States District Court
For the Northern District of California

1    A plaintiff may defeat summary judgment by offering direct or circumstantial

2    evidence "that a discriminatory reason more likely motivated the employer," or "that the

3    employer's proffered explanation is 'unworthy of credence' because it is internally

4    inconsistent or otherwise not believable."  Anthoine v. North Central Counties Consortium,

5    605 F.3d 740, 753 (9th Cir. 2010) (quotation and citation omitted).  That is, Schiff must offer

6    evidence that defendants' stated reasons for the alleged adverse action(s) were untrue or

7    pretextual, or evidence that the City or Chief Fong acted with a discriminatory animus, or a

8    combination of the two, such that a reasonable trier of fact could conclude that defendants

9    engaged in intentional discrimination.  See Goodwin v. Hunt Wesson, Inc., 150 F.3d 1217,

10   1222 (9th Cir. 1998).

11   Direct evidence includes "clearly sexist, racist, or similarly discriminatory statements

12   or actions by the employer."  Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir.

13   2005).  By contrast, circumstantial evidence is evidence "that tends to show that the

14   employer's proffered motives were not the actual motives because they are inconsistent or

15   otherwise not believable."  Godwin, 150 F.3d at 1222.

16   "These two approaches are not exclusive; a combination of the two kinds of

17   evidence may in some cases serve to establish pretext so as to make summary judgment

18   improper."  Anthoine, 605 F.3d at 753 (quotation and citation omitted).  However, "[a]

19   plaintiff may not defeat a defendant's motion for summary judgment merely by denying the

20   credibility of the defendant's proffered reason for the challenged employment action."

21   Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 n. 6 (9th Cir. 2006).  "When

22   the evidence on which a plaintiff relies is circumstantial, that evidence must be specific and

23   substantial to defeat the employer's motion for summary judgment.  Anthoine, 605 F.3d at

24   753 (quotation and citations omitted).

25   In his own motion for summary judgment, Schiff contends that defendants have

26   "utterly failed to articulate a legitimate, non-discriminatory reason for why [the City] rejected

27   Schiff despite his high test scores and being the most highly decorated Sergeant on the

28   force."  He claims that proof of pretext includes "the historical fact that banding was used to

United States District Court

For the Northern District of California

1  increase the pool of available black candidates, and when such black candidates are within

2  the band, they are virtually always selected, despite their rank on the race neutral exam."

3       In support of this argument, he cites to his own declaration, which repeats the above

4  assertion verbatim, and adds that "the statistical evidence of the promotions off the 2000

5  List (which was the subject of the litigation in <u>Schiff I</u>) is also evidence of pretext," and that

6  "changing the certification rule from Rule of Five to 'banding' also shows an intent to

7  discriminate."   He also claims that pretext includes "actions by the City to reweigh exam

8  scores to give an advantage to blacks who did poorly on the written and multiple choice

9  portions" of a Sergeant/Inspector examination that was given years prior to the

10  implementation of the 2000 list.

11       The court finds that the motion must be GRANTED.  First, Schiff provides no direct

12  evidence of discrimination.  He cites to no explicitly racist or discriminatory actions by the

13  City or his supervisors, and provides no evidence that banding was used as a

14  discriminatory selection tool during the time period at issue in the present case.

15       The CSC Rules in effect at the time of the creation of the certification rule for the

16  2005 Q-60 Lieutenant promotional examination specify that secondary criteria used in the

17  selection process "may not be based on relationship, race, religion, gender, national origin,

18  ethnicity, age, disability, gender identity, political affiliation, sexual orientation, ancestry,

19  marital status, color, medical condition, or other non-merit factors or otherwise prohibited

20  nepotism or favoritism."  S.F. Civ. Serv. Comm. R. 213.4.6.

21       Schiff has pointed to no direct evidence supporting his claim that the certification rule

22  was discriminatory, or that race was a permitted consideration.  As for the  "Job Analysis,"

23  he does not indicate which portion of the 32-page document that he believes supports his

24  argument, and does not explain what the "Job Analysis" means or why it was created by

25  the City.[5]

26

27  _____

28       [5]  The "Job Analysis" also lacks foundation and personal knowledge, and is hearsay. Moreover, it appears to have been created three years after the 2005 certification rule was put into place.

United States District Court

For the Northern District of California

1      Schiff claims that the promotional selections reflected a general environment and

2   history of discrimination against Caucasian males within the Department, but has no

3   evidence of such discrimination.  Moreover, Chief Fong, who made the 2008 selections,

4   was not involved in any of the prior actions Schiff contends were discriminatory.  Similarly,

5   Schiff has no evidence that any of Captain Barrett's conduct was tied to his race.  (In fact,

6   Captain Barrett, like Schiff, is white.)

7      Second, Schiff fails to meet his burden under the McDonnell Douglas test of showing

8   that the defendants' non-discriminatory reasons were a pretext for discrimination.  His

9   subjective belief (as reflected in his declaration) that the City discriminated against him

10  when he was denied promotion, is unpersuasive, and is insufficient to defeat defendants'

11  motion for summary judgment.

12      To show pretext, Schiff asserts that banding was used in the past, that blacks are

13  "virtually always selected" for promotion, that the City "reweighed" portions of a 1983

14  Sergeant/inspector exam, and that "statistical evidence" shows discriminatory promotions

15  from the 2000 list.  But Schiff provides no admissible evidence to support any of those

16  claims.  In particular, he provides no evidence that "banding" was used to discriminate in

17  connection with making promotions off the 2005 Lieutenant eligible list, and simply offers

18  his own speculation that the City uses banding to "artificially enlarg[e] . . . the pool of

19  minority applicants so that more will be selected" or that "banding was used to increase the

20  pool of available black candidates."  Moreover, he establishes no causal connection

21  between the City's conduct concerning a 30-year old exam for an unrelated classification,

22  or the City's conduct in relation to the prior consent decree, and his own 2008 non-

23  promotion.

24      Schiff also claims pretext based on the assertion that Chief Fong improperly relied

25  on allegations of misconduct rather than confirmed misconduct to pass him over for

26  promotion.  But he provides no evidence to support this claim.  Moreover, Chief Fong

27  testified that a Lieutenant's good judgment is key, as he functions as a "middle manager."

28  Thus, she promoted candidates on that basis.

1   He asserts further that Chief Fong refused to promote any <u>Schiff I</u> plaintiff.  But the

2   facts are contrary to that claim, as she promoted three <u>Schiff I</u> plaintiffs to Lieutenant from

3   the prior list, during the course of that suit, which rebuts any inference of retaliatory animus.

4   In short, Schiff has no evidence of any racial preference towards blacks, or a pattern

5   of discrimination against whites, and thus has no evidence of discriminatory pretext.

6   Moreover, the circumstantial evidence is to the contrary – of the 42 promoted officers from

7   the 2005 list, two were African-American.  Moreover, 31 of those promoted ranked above

8   Schiff on the list, and 30 of the 42 (almost 3/4) who were promoted were Caucasian.

9   The fact that Schiff personally does not believe the asserted reasons why he was

10  not promoted is not sufficient to transform those reasons into a pretext for discrimination.

11  Schiff has no evidence to show that the SFPD's non-discriminatory reasons were

12  pretextual.

13      3.      Retaliation claims

14  Defendants assert that Schiff's retaliation claim fails because he fails to establish a

15  prima facie case of retaliation, and fails to show that defendants' articulated reasons for

16  their decisions were pretextual.

17  Section 1981 does not include an express retaliation provision, but federal courts

18  have found that § 1981 encompasses retaliation claims.  <u>See</u>, <u>e.g.</u>, <u>Manatt</u>, 339 F.3d at

19  795.  Section 1981 retaliation claims are analyzed under the framework of a claim for

20  retaliation under Title VII.  <u>Id.</u> at 801.  That is, a plaintiff alleging retaliation under § 1981

21  may either proceed by producing direct or circumstantial evidence showing that a

22  discriminatory reason more likely than not motivated the employer, or may apply the

23  <u>McDonnell Douglas</u> burden-shifting framework.  <u>Surrell</u>, 518 F.3d at 1105; <u>see also</u> <u>Davis v.</u>

24  <u>Team Elec. Co.</u>, 520 F.3d 1080, 1088-89 (9th Cir. 2008).

25  Under the <u>McDonnell Douglas</u> analysis, to make out a prima facie case of retaliation,

26  an employee must show that he engaged in a protected activity; that his employer

27  subjected him to an adverse employment action; and that a causal link exists between the

28  protected activity and the adverse action.  <u>Ray v. Henderson</u>, 217 F.3d 1234, 1240 (9th Cir.

United States District Court

For the Northern District of California

1   2000).  Once the prima facie case is established, the burden shifts to the defendant to set

2   forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must

3   produce evidence to show that the stated reasons were a pretext for retaliation.  Bergene v.

4   Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1140-41 (9th Cir.

5   2001).

6         Here, defendants concede that Schiff engaged in protected activity (filing the Schiff I

7   action in 2003), and that he suffered an adverse employment action (wasn't promoted in

8   October 2008).  However, they argue that he cannot show a causal link between the

9   decision not to promote him and his prior protected activities.

10         A causal link can be established by "an inference derived from circumstantial

11   evidence."  Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1075 (9th Cir. 2003)

12   (quotation and citation omitted).  An example of such circumstantial evidence would be

13   evidence that the employer knew that the employee had engaged in protected activities,

14   and the proximity in time between the protected action and the alleged retaliatory

15   employment action.  Jordan v. Clark, 847 F.2d 1368, 1376 (9th Cir. 1988); see also Yartzoff

16   v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

17         Schiff argues that the final party to sign the settlement agreement in Schiff I did so in

18   August 2007 (although he himself signed it on March 6, 2006).  Thus, he suggests, the

19   settlement of Schiff I and his non-promotion in 2008 were sufficiently close in time.  He also

20   contends that he can show the causal link by the fact that Chief Fong was a defendant in

21   Schiff I, and personally participated in the mediation that led to the settlement; that she did

22   not select him for the position of Lieutenant, and after the settlement in Schiff I, she did not

23   select any of the Schiff I plaintiffs who were eligible to be promoted off the 2005 list.

24         Schiff concedes that a long period of time between the two events might weaken the

25   evidence of causation, but argues that it is not dispositive.  He asserts that Chief Fong

26   admitted in her deposition that she was aware of the settlement in Schiff I, and that she

27   personally participated in the litigation and the mediation that led to the settlement.  He

28   contends that "[t]he settlement check in Schiff I had not even been cut when Chief Fong

27

**United States District Court**
For the Northern District of California

1   passed Schiff over for promotion in January 2008." He claims that because he was in the

2   "band" on the 2005 List, and the selection rule was Rule of Five for the first 14 requisitions,

3   Chief Fong's very first opportunity to retaliate against him by denying him a promotion did

4   not occur until January 2008.

5        He asserts, in addition, that there is other evidence that supports a causal link.

6   Citing to his own declaration, he claims that his 23-year history of working for the SFPD

7   with no serious discipline (at least before the Yoakum incident) raises the inference of a

8   causal link; and also asserts that a causal connection is shown by the fact that Captain

9   Barrett made five disciplinary charges against him, four of which (according to him) were

10  later determined to be unfounded. He claims that these facts are "sufficient to support a

11  finding of retaliatory intent, if the fact finder wishes to draw the necessary inferences."

12       Defendants dispute that Schiff can establish the necessary causal link, but argue

13  that even if he could establish a prima facie case of retaliation, he cannot rebut their

14  legitimate, non-retaliatory reasons for the non-promotions. Schiff's claims for retaliation

15  encompass the same alleged adverse employment actions as his claims for discrimination.

16  Accordingly, defendants argue, Schiff cannot rebut the City's legitimate non-discriminatory

17  reasons for the actions he considers retaliatory, for the same reasons he cannot rebut the

18  City's legitimate reasons for the actions he deems discriminatory.

19       Schiff must show that the articulated reasons are pretextual either directly by

20  showing that a discriminatory reason more likely motivated the City, or indirectly by

21  showing that the City's proffered explanation is unworthy of credence. E.E.O.C. v. Boeing

22  Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting Burdine, 450 U.S. at 256). A proffered

23  explanation is "unworthy of credence" if it is "internally inconsistent or otherwise not

24  believable." Chuang, 225 F.3d at 1127. As noted above in the discussion of the

25  discrimination claims, "[w]hen the evidence on which a plaintiff relies is circumstantial, that

26  evidence must be specific and substantial to defeat the employer's motion for summary

27  judgment. Anthoine, 605 F.3d at 753 (quotation and citations omitted).

28       That is, to avoid summary judgment, Schiff must produce admissible evidence

**United States District Court**
For the Northern District of California

1    showing that the defendants' stated reasons for not promoting him in January and October

2    2008, or for any of the other conduct Schiff challenges, was false and that the true reason

3    was retaliation for his protected activities. <u>Chuang</u>, 225 F.3d at 1127.  Defendants assert

4    that Schiff cannot meet this standard.

5         With regard to the reasons given by the City for failing to promote him, Schiff argues

6    that for the reasons set forth in his opposition to the City's motion as to the discrimination

7    claims, he has made a sufficient showing that the City's reasons were pretextual.

8         He asserts that the stated rationale for the stay-away order – to protect Ms. Yoakum

9    and her family – does not hold up under scrutiny.  He contends that the City's explanation

10   is not worthy of credence, because the City did not arrest the person who warned about the

11   gang threat, and because it has not shown that the threat was prompted by Schiff's work

12   with the Yoakum family or with the community.  He also claims that the breadth of the stay-

13   away order is "suggestive" of pretext, because it forbade him from meeting with any

14   member of the family even outside of the City, and to contact Ms. Yoakum by electronic

15   means.  He argues that there is no way that gangsters could learn about any email contact.

16        Schiff also argues that the fact that Chief Fong gave "inconsistent reasons" for the

17   stay-away order is suggestive of pretext (though he does not explain what was inconsistent

18   about those reasons).  He claims that even if her reasons were "true," there was no reason

19   why the order continued to remain in effect well after the disciplinary process had

20   concluded (apparently referring to his disciplinary hearing before the Police Commission),

21   and why it continues to this day.

22        The court finds that the motion must be GRANTED.  Schiff's only protected activity is

23   his 2003 lawsuit against the City, and the charges of discrimination filed with the Equal

24   Employment Opportunity Commission and the California Department of Fair Employment

25   and Housing prior to that lawsuit.  Schiff has provided no evidence showing that Chief Fong

26   was aware of when the final signature on the settlement was actually provided, that she

27   had any involvement in the process, or that she was involved in the pay-out of money

28   related to the settlement.  Indeed, Chief Fong testified that she could not say exactly what

United States District Court

For the Northern District of California

1    the terms of the settlement were – that she knew only that there was a settlement at some

2    point.

3           As discussed above, Schiff agreed to settle the Schiff I lawsuit in March 2006.  Chief

4    Fong's promotional decisions at issue were made beginning in January 2008, almost eight

5    years after Schiff filed his administrative complaint with the DFEH, five years after he filed

6    the complaint in Schiff I, four years after he filed his complaint with the EEOC, and two

7    years after he settled his claims in Schiff I.

8           This significant passage of time between his protected activity and the allegedly

9    retaliatory actions vitiates any causal inference.  See, e.g., Cornwell, 439 F.3d at 1036

10   (seven-month gap too great to infer that employee's complaint caused his termination);

11   Manatt, 339 F.3d at 801 (nine months between a plaintiff's complaint and the adverse

12   decision was too long to satisfy causation prong); Clark County Sch. Dist. v. Breeden, 532

13   U.S. 268, 273-74 (2001) (per curium) (citing cases finding three-month period and

14   four-month period too long).

15          Schiff's claim that Chief Fong failed to promote him for retaliatory reasons also fails

16   because Chief Fong promoted three plaintiffs from the Schiff I lawsuit to the Lieutenant

17   position – Kurt Bruneman, Donna Leonard (Meixner), and Mark Osuna.  Individuals are

18   similarly situated when they have similar jobs and display similar conduct.  Vasquez v.

19   County of Los Angeles, 349 F.3d 634, 641-42 (9th Cir. 2003).  While a showing that

20   defendants treated similarly situated employees outside Schiff's protected class more

21   favorably would be probative of pretext, see id. at 641, n.14, the evidence here shows that

22   some candidates who were plaintiffs in the Schiff I lawsuit were also promoted off the 2005

23   list.

24          As for Captain Barrett, Schiff has provided no evidence that she was even aware of

25   his prior protected activity.  The Ninth Circuit has held that employment decisions made

26   when the decision-maker did not know that the affected employee had engaged in

27   protected activity cannot be causally linked to such activity.  See Cohen v. Fred Meyer,

28   Inc., 686 F.2d 793, 796-97 (9th Cir. 1982).  Captain Barrett states in her declaration that

United States District Court

For the Northern District of California

1 she was unaware of the contents or claims asserted in <u>Schiff I</u>.  In addition, Schiff provides

2 no evidence that Chief Fong discussed Schiff's prior lawsuit or prior complaints with

3 Captain Barrett.

4      Because of the relatively long lapse of time between his filing of the <u>Schiff I</u> lawsuit in

5 2003, and his non-promotion in 2008, Schiff has not established a causal connection

6 between any protected activity and the failure to promote him or any other adverse action.

7 Schiff suggests that it was the settlement of <u>Schiff I</u> that precipitated the retaliatory actions,

8 but the settlement was not a protected activity, and he does not explain how the settlement

9 of the lawsuit would induce Chief Fong to retaliate against him.

10      Moreover, Chief Fong signed the settlement agreement in September 2007, almost

11 a year before passing Schiff over for promotion in October 2008.  Schiff argues that

12 disciplinary complaints filed against him by Captain Barrett somehow establish retaliatory

13 animus, but he does not explain how those complaints are evidence of a causal connection

14 between his prior lawsuit and Chief Fong's decision not to promote him.  There is no

15 evidence that Captain Barrett in fact initiated any disciplinary charges against Schiff, or that

16 Captain Barrett had any discussion with Chief Fong regarding the <u>Schiff I</u> lawsuit, the

17 settlement, or even the fact that Schiff was on the promotional list.

18      Nevertheless, even assuming for the sake of argument that Schiff has established a

19 prima facie case, the court finds that he has failed to provide evidence showing that

20 defendants' reasons for not promoting him are a pretext for retaliation.

21      Finally, to the extent that Schiff is attempting to assert that the stay-away order was

22 retaliatory, he cannot prevail because the stay-away order cannot be considered an

23 adverse employment action. In addition, he has not provided any evidence that defendant's

24 articulated, nondiscriminatory reasons for not promoting him are pretextual.

25      4.    Other arguments

26      Defendants also contend that Chief Fong is entitled to qualified immunity in

27 connection with the equal protection claim under § 1983, that any claims challenging the

28 August 2005 adoption of banding for the 2003 Lieutenant eligible list are untimely and

United States District Court

For the Northern District of California

1   barred by Schiff's March 2006 release of claims, and that the § 1981 claim fails because

2   Schiff has no contract of employment with the City.  As summary judgment has been

3   granted as to all claims remaining in the case, the court does not address these additional

4   arguments separately.

5   B.       Schiff's Motion

6           Schiff seeks a ruling that banding is "a form of race-norming" and that it is "a

7   discriminatory selection tool" that violated his right to equal protection, and also seeks a

8   ruling that Chief Fong's articulated reasons for not selecting him for promotion in January

9   2008 were a pretext for discrimination.  The motion is DENIED.

10          For the reasons stated above in the discussion of defendants' motion for summary

11   judgment as to the discrimination claims, the court finds that Schiff has provided no

12   evidence that the certification rule was discriminatory, or that race was a permitted

13   consideration in the promotional decisions relating to the 2005 Lieutenant eligible list.

14          In addition, Schiff waived any claim relating to events that occurred prior to March

15   30, 2006 when he signed the settlement and release in the <u>Schiff I</u> case.  Because the

16   settlement agreement contained a release of "all claims, known or unknown," and because

17   the certification rule for the 2005 Lieutenant eligible list had already been adopted as of the

18   date Schiff signed the agreement, any claim regarding the adoption of banding is barred.

19          The court also finds that Schiff has not provided evidence showing that the

20   articulated reasons for not selecting him for promotion in January 2008 were a pretext for

21   discrimination.  The only evidence he cites is a June 2, 2010 e-mail from Thomas Shawyer

22   to Linda Simon, which he claims explains Chief Fong's decision not to promote him in

23   January 2008.

24          Apart from the fact that the document is hearsay, and is also inadmissible because it

25   is not authenticated and is unsupported by any declaration of personal knowledge, the

26   document supports Chief Fong's testimony that she reviewed each candidate's "secondary

27   criteria" qualifications and the needs of the Department; that she sought to promote the

28   candidates who would be the strongest managers to help in combating a trend of violent

United States District Court
For the Northern District of California

1 crime, and would help advance other Department initiatives; and that it was to this end that

2 she reviewed each candidate's skills, work history, experience in supervising crime

3 prevention and investigation, and administrative skills.

4       The document further indicates that there were a limited number of requisitions, and

5 that all those promoted ranked higher on the list than Schiff did, and all had solid patrol,

6 administrative, or investigative experience.  This supports Chief Fong's testimony that she

7 reviewed Schiff's resume (and the resumes for each candidate), and based on the number

8 of requisitions, felt comfortable that the people above Schiff on the list would be able to

9 serve in the rank of Lieutenant.  She testified that she had a limited number of requisitions

10 to fill, all officers promoted in January 2008 ranked higher than Schiff, and based on her

11 review of their history, she was confident that those candidates would be the best to

12 promote to the position of Lieutenant.

13 **CONCLUSION**

14       In accordance with the foregoing, defendants' motion for summary judgment is

15 GRANTED, and plaintiff's motion is DENIED.

16

17 **IT IS SO ORDERED.**

18 Dated: September 8, 2011

19                            _____
                           PHYLLIS J. HAMILTON
                           United States District Judge

20

21

22

23

24

25

26

27

28